USDC SCAN INDEX SHEET

















GEP   4/7/05   11:19

3:05-CV-00706   DUBBERT V. BARTLETT

*1*

*CMP.*

1   DANIEL L. GERMAIN (Cal. Bar No. 143334)
    ROSMAN & GERMAIN LLP
2   815 Moraga Drive
    Los Angeles, CA 90049-1633
3   Phone: (310) 440-8600
    Fax: (310) 440-8615
4
    ERIC L. ZAGAR
5   SCHIFFRIN & BARROWAY, LLP
    280 King of Prussia Road
6   Radnor, PA 19087
    Phone: (610) 667-7706
7   Fax: (610) 667-7056

8   Counsel for Plaintiffs

9

10              IN THE UNITED STATES DISTRICT COURT

11        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12  RANDY DUBBERT, Derivatively on Behalf      Case No.
    of Nominal Defendant ADVANCED
13  MARKETING SERVICES, INC.,
                                               '05 CV   706 H    (RBB)
14                              Plaintiff,

15              v.                             VERIFIED DERIVATIVE COMPLAINT
                                               FOR BREACHES OF FIDUCIARY
16  ROBERT F. BARTLETT, STEVEN T.              DUTIES
    BOYLE, SANDRA MILLER CHRISTIE,
17  LYNN S. DAWSON, MARK J.
    FLOURNOY, MICHAEL J. FOCHT,
18  BRUCE E. GROUT, JAMES A. LEIDICH,
    EDWARD J. LEONARD, KEVAN M.
19  LYON, TRYGVE E. MYHREN, MICHAEL
    M. NICITA, E. WILLIAM SWANSON,
20  CHARLES C. TILLINGHAST, and ADAM
    R. ZOLDAN,
21
                               Defendants,
22
            -and-
23
    ADVANCED MARKETING SERVICES,
24  INC.,

25                   Nominal Defendant.        JURY TRIAL DEMANDED

26

27

28

ORIGINAL            VERIFIED DERIVATIVE COMPLAINT

### NATURE OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of nominal defendant Advanced Marketing Services, Inc. ("AMS" or the "Company") against certain current and former members of its Board of Directors (the "Board") and certain executive officers for breaches of fiduciary duties.

### JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

3.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

4.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

### PARTIES

5.     Plaintiff Randy Dubbert, a citizen of the State of Kansas, is, and was at all relevant times, a shareholder of nominal defendant AMS.

6.     Nominal Defendant AMS is a Delaware corporation with its principal executive offices located at 5880 Oberlin Drive, Suite 400, San Diego, California 92121.  According to its public filings, AMS provides global customized services to book retailers and publishers.

7.     Defendant Charles C. Tillinghast ("Tillinghast"), a citizen of the State of California, served as Chairman of the Board from 1994 until his retirement in November 2004, and as President and Chief Executive Officer of the Company from 1994 to 1996 and again from April 2004 until his retirement in November 2004.

/////

VERIFIED DERIVATIVE COMPLAINT

1       8.     Defendant Michael M. Nicita ("Nicita"), a citizen of the State of California,

2 served as a director of AMS from 1994 until his resignation in April 2004, as President and Chief

3 Operating Officer of the Company from 1994 to 1997, and as Chief Executive Officer of the

4 Company from 1997 until his resignation in April 2004.

5       9.     Defendant Edward J. Leonard ("Leonard"), a citizen of the State of California,

6 served as Chief Financial Officer of AMS from 1999 until his resignation in April 2004.

7      10.    Defendant Michael J. Focht ("Focht"), a citizen of the State of California, has

8 served as Executive Vice President of Operations of AMS since 2000.

9      11.    Defendant Kevan M. Lyon ("Lyon"), a citizen of the State of California, served as

10 the Company's Executive Vice President of Distribution Services from 1997 until her resignation

11 in October 2004.

12      12.    Defendant Adam R. Zoldan ("Zoldan"), a citizen of the State of California, served

13 as the Company's Executive Vice President of Wholesaler/Retailer Services from 2001 until

14 November 2004, when he was promoted to Chief Marketing Officer.

15      13.    Defendant Sandra Miller Christie ("Christie"), a citizen of the State of California,

16 served as the Company's Vice President of Advertising from 1997 until her employment was

17 terminated in May 2004.

18      14.    Defendant Steven T. Boyle ("Boyle"), a citizen of the State of California, has

19 served as Vice President and Treasurer of the Company since 2002.

20      15.    Defendant Mark J. Flournoy ("Flournoy"), a citizen of the State of California,  has

21 served as Vice President and Controller of AMS since 2002.

22      16.    Collectively, defendants Tillinghast, Nicita, Leonard, Focht, Lyon, Zoldan,

23 Christie, Boyle, and Flournoy will be referred to herein as the "Officer Defendants."

24      17.    Defendant James A. Leidich ("Leidich"), a citizen of the State of California, has

25 served as a director of AMS and as Chairman of the Audit and Compliance Committee of the

26 Board (the "Audit Committee") at all times relevant hereto.

27 /////

28 /////

VERIFIED DERIVATIVE COMPLAINT

1   18. Defendant Lynn S. Dawson ("Dawson"), a citizen of the State of New York, has

2 served as a director of AMS and as a member of the Audit Committee at all times relevant

3 hereto.

4   19. Defendant Bruce E. Grout ("Grout"), a citizen of the State of Ohio, has served as

5 a director of AMS and as a member of the Audit Committee at all times relevant hereto.

6   20. Defendant E. William Swanson ("Swanson"), a citizen of the State of California,

7 has served as a director of AMS and as a member of the Audit Committee at all times relevant

8 hereto.

9   21. Collectively, defendants Leidich, Dawson, Grout, and Swanson will be referred to

10 herein as the "Audit Committee Defendants."

11   22. Defendant Robert F. Bartlett ("Bartlett"), a citizen of the State of California, has

12 served as a director of AMS at all times relevant hereto.

13   23. Defendant Trygve E. Myhren ("Myhren"), a citizen of the State of Colorado, has

14 served as a director of AMS at all times relevant hereto.

15   24. Collectively, the defendants identified in paragraphs 6-22 will be referred to

16 herein as the "Individual Defendants."

17      **DUTIES OF THE INDIVIDUAL DEFENDANTS**

18   25. By reason of their positions as officers and/or directors of the Company and

19 because of their ability to control the business and corporate affairs of the Company, the

20 Individual Defendants owed the Company and its shareholders the fiduciary obligations of good

21 faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control

22 and manage the Company in a fair, just, honest, and equitable manner.  The Individual

23 Defendants were and are required to act in furtherance of the best interests of the Company and

24 its shareholders so as to benefit all shareholders equally and not in furtherance of their personal

25 interest or benefit.  Each director and officer of the Company owes to the Company and its

26 shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

27 affairs of the Company and in the use and preservation of its property and assets, and the highest

28 obligations of fair dealing.

VERIFIED DERIVATIVE COMPLAINT

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

27.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

    a.    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.    exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

    c.    exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

    d.    when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

28.     The Individual Defendants, particularly the Officer Defendants and Audit Committee Defendants, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

    (1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

    (2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

        (a)    transactions are executed in accordance with management's general of specific authorization;

- 4 -

(b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

29.    Moreover, according to Appendix D to Statement on Auditing Standards No. 55, ("SAS 55"), management should consider, among other things, such objectives as: (i) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (ii) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

30.    According to SAS 55.13:

> Establishing and maintaining an internal control structure is an important management responsibility.  To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

31.    AMS's Audit Committee Charter provides that the Audit Committee shall, among other things:

a.    "Review the Corporation's annual financial statements and certain other financial information submitted to any governmental body, or the public, including any certification, report, opinion or review rendered by the independent public accountants, as deemed necessary by management of the Corporation."

b.    "Review with financial management and the independent public accountants the Forms 10-K, 10-Q and 8-K as applicable prior to their filing or prior to the release of earnings."

c.    "In consultation with the independent public accountants, review the integrity of the Corporation's financial reporting processes, both internal and external."

d.    "Establish regular and separate systems of reporting to the Audit and Compliance Committee by each of management and the independent public accountants regarding significant judgments, if any, made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments."

e.    "Establish the objectives for, and monitor, the activities of the Corporation's Internal Audit Department which shall have a direct reporting relationship to the Audit and Compliance Committee and, through it, to the Board of Directors."

VERIFIED DERIVATIVE COMPLAINT

f.    "Review management's monitoring of the Corporation's compliance with the Corporation's Standards of Business Conduct and ensure that management has the proper monitoring controls in place to ensure that the Corporation's financial statements, reports and other financial information disseminated to governmental organizations, and the public satisfy legal requirements."

## FACTUAL ALLEGATIONS

32.    On July 22, 2003, the Federal Bureau of Investigation executed a search warrant at AMS's headquarters in connection with an investigation of various criminal charges, including mail fraud, wire fraud, failure of corporate officers to certify financial reports, and conspiracy. On or about the same day, the U.S. Attorney's Office for the Southern District of California issued to the Custodian of Records of AMS a subpoena to testify before a grand jury.

33.    On September 23, 2003, the Securities and Exchange Commission ("SEC") issued to two AMS officers and to the Custodian of Records of AMS subpoenas in connection with an SEC investigation of the Company.

34.    On January 14, 2004, AMS issued a press release which stated:

Advanced Marketing Services, Inc. (NYSE:MKT) announced today that it will restate its previously filed financial statements for the fiscal years in the five-year period ended March 31, 2003. The Company also issued revised earnings guidance for the fiscal year ending March 31, 2004.

The restatement results from the Company's ongoing review of its cooperative advertising practices and related accounting, and relates primarily to the timing and quantification of recognition of revenue and reversal of accrued liabilities. The effect of the restatement currently is expected to be a total reduction to cumulative net income for the five-year period of between approximately $3.0 million and $9.0 million. Cumulative net income for the five-year period, as previously reported, was $85.0 million.

The Company's review has established that for the five-year period: (1) the estimated circulation communicated to publishers for some cooperative advertising publications was greater than actual subsequent circulation; and (2) certain accrued liabilities related to cooperative advertising were inappropriately reversed into income. The Company has determined that the advertising revenue and related costs, and the income from the accrued liabilities reversed, should be deferred until the Company completes the process of reaching appropriate resolutions with customers and vendors.

The Company has strengthened its internal controls and procedures, including revenue recognition guidelines, and has implemented other remedial measures, including the restructuring of its advertising department, to prevent recurrence of the circumstances that led to the restatement.

- 6 -

VERIFIED DERIVATIVE COMPLAINT

Because the restatement involves the deferral of certain revenue and income, a portion of the reduction to the cumulative net income for the five-year period may be earned in future periods upon: (1) the completion of resolutions with customers and publishers; and (2) the performance of services and incurrence of costs arising out of those resolutions that are deemed necessary for revenue recognition. The remaining portion of the amount restated will be paid to customers and vendors.

The restatement constitutes an event of default under the Company's Revolving Credit Agreement, and the banks have agreed to forbear the default through January 30, 2004. The forbearance is consistent with the previously reported agreement with the banks to forbear until January 30, 2004, the event of default resulting from the Company's delay in timely filing its Forms 10-Q for the first and second quarters of fiscal year 2004. The Company intends to complete and file its Forms 10-Q as promptly as possible. The Company is seeking a longer forbearance from the banks, but there can be no assurance that they will continue to forbear thereafter. As of January 14, 2004, the Company had no outstanding balance under the Revolving Credit Agreement.

The estimated range of the restatement in this public announcement relates solely to the resolutions with vendors and customers described above, and is independent of the ongoing investigations being conducted by the United States Attorney for the Southern District of California and the Securities and Exchange Commission. The Company is cooperating fully in the investigations but cannot predict the outcomes of the investigations.

The information and estimates concerning the restatement described in this public announcement are subject to completion of analyses by the Company and of required audit work by the Company's independent auditor. The Company intends to file an amended Form 10-K for the year ended March 31, 2003, including restated financial statements, as soon as the required analyses and audits have been completed. The Company cautions that, until the amended Form 10-K is filed, its historical financial statements should not be relied upon. The Company intends to file its Forms 10-Q for first three quarters of fiscal year 2004 ended June 2003, September 2003 and December 2003 as soon as the amended Form 10-K is filed.

The Company also announced today a revision of previously announced guidance relating to financial performance for its fiscal year 2004 ending March 31, 2004. The Company continues to believe that net sales for the full year will approximate the $1.0 billion to $1.1 billion previously announced. However, after analyzing the mix of products sold during the third quarter, which included the holiday season, the Company now believes that earnings per share will be in the approximate range of $0.30 to $0.40 per diluted share. Most of the decrease results from higher-than-forecasted sales of lower-margin bestseller and mass-market categories, lower-than-forecasted sales of the higher-margin juvenile, gift and cookbook categories, and costs related to the ongoing investigations by the US Attorney and the Securities and Exchange Commission.

The Company expects that the shift in sales mix toward lower-margin categories may continue, and is addressing ways to reduce costs and improve efficiency in response to the trend. One example is described in a separate public announcement made today concerning the consolidation of the Company's distribution operations. The current plan is to close the Reno facility by June 2004. The facility was acquired as part of the Publishers Group West acquisition in January 2002. The Company estimates expenses associated with this action to

- 7 -

be approximately $3.0 million, with $1.0 million falling in the fourth quarter of fiscal year 2004 and $2.0 million falling in fiscal year 2005. Ongoing annual savings are estimated to be approximately $2.0 million, with a portion of these savings derived from lower costs associated with the new AMS warehouse management system (PkMS).

The Company is fully focused on resolving the issues that led to the restatement as it moves toward being able once again to file its financial statements in a timely manner. It is equally committed, with projections to reach the $1.0 billion net sales milestone in the current fiscal year, to continue to take steps to increase productivity and restore historical profit levels.

35.   On January 15, 2004, *The San Diego Union-Tribune* reported:

Advanced Marketing Services, which distributes best sellers to warehouse clubs such as Costco and Sam's Club, said yesterday that it will restate its earnings for five years and reduce net income over the period by up to $9 million.

The San Diego-based company said the restatement, which covers the period through March 2003, was related to an internal investigation that discovered irregularities in its advertising services department, which mailed promotional material to readers under a cooperative advertising agreement with publishers.

The company said circulation estimates that it had given publishing houses for the promotions exceeded the number of magazines and postcards that were actually mailed, and some costs for the ads had been reported by the company as income.

Apparently, some money that would have been spent on the ads instead went toward the bottom line.

AMS also said yesterday that it would cut its earnings forecast for fiscal 2004. The company's shares fell $1.82, or 15 percent, to close at $10.15.

AMS is the subject of ongoing investigations by the Securities and Exchange Commission and the U.S. attorney for the Southern District of California, apparently focusing on the way the company spent money in the co-op promotional pool.

Company officials said yesterday that they initiated their own investigation of the irregularities before the government probes were announced last year.

"As a result of the internal review, we reacted," chief executive Mike Nicita said.

The ad services division has been brought under the umbrella of the company's general sales group, Nicita said, adding that some employees who had worked in the department "have left the company," although he declined to say how many have departed or whether they had resigned or had been fired.

Advertising services orchestrated authors' book signings and coordinated the promotion of books in newspapers and other media.

Among other things, the division would use its database to identify customers to be included in promotional mailings for new-book releases. For instance, AMS would send flashy postcards to readers who may have bought the last John

- 8 -

1    Grisham book, but didn't buy the author's new legal thriller, Nicita said.

2    The amount of money allocated to the promotional pool by publishers was based
     on the number of books sold by AMS in the previous year.

3

4    AMS said the reduction in net income for the five-year period will range from $3
     million to $9 million and include payments to its customers and vendors related to
     the advertising flap. The company previously reported $85 million in net income
5    over the five-year period.

6    36.    On April 12, 2004, AMS issued a press release which stated:

7    Advanced Marketing Services, Inc. (NYSE:MKT), a leading distributor of general
     interest, computer and business books and books on tape to the membership
8    warehouse club industry and other specialty retailers, today announced that
     Charles Tillinghast has been named President and Chief Executive Officer. Mr.
9    Tillinghast, who is now Chairman of the Board, was the President and Chief
     Executive Officer of Advanced Marketing Services ("AMS") since the company's
10   founding in 1982 until 1996. The AMS Board of Directors also named Bruce
     Myers as the Company's Chief Financial Officer. Mr. Myers has recently been
11   providing high-level accounting advice to AMS and the independent directors. In
     addition, Bob Bartlett, one of AMS's independent Directors, has been named the
12   company's Non-Executive Chairman of the Board. The Board of Directors also
     accepted the resignation of Michael Nicita, who had served as President and CEO,
13   and Edward Leonard, who had been the Company's Chief Financial Officer.

14

15   37.    On April 29, 2004, AMS issued a press release which stated:

16   Advanced Marketing Services, Inc. (NYSE:MKT), a leading global provider of
     customized wholesaling and distribution services to book retailers and publishers,
17   announced that it has signed a new, five-year, $60 million revolving secured credit
     facility with Wells Fargo Foothill, part of Wells Fargo & Company
18   (NYSE:WFC). This new agreement replaces the Company's $45 million credit
     facility previously provided by other lenders.
19

20   38.    On June 14, 2004, AMS issued a press release which stated:

21   Advanced Marketing Services Inc. (NYSE:MKT) ("AMS" or the "Company"), a
     leading global provider of customized wholesaling and distribution services to
22   book retailers and publishers, announced that it will not file its Form 10-K for the
     fiscal year ended March 31, 2004 on time. The Company has filed a Form 12b-25
23   with the Securities and Exchange Commission indicating the delayed filing of the
     fiscal 2004 Form 10-K.
24

25   As the Company previously announced, it is in the process of restating financial
     information for the fiscal year ended March 31, 2003 and certain prior fiscal years.
     The restatement relates to certain cooperative advertising practices and related
26   accounting, and relates primarily to the timing and quantification of recognition of
     revenue and reversal of accrued liabilities. The Company currently estimates that
27   the cumulative effect of the restatement will be a reduction to net income of
     approximately $10 million for the seven-year period ended March 31, 2003. This
28   estimate is subject to change based on continuing work related to the restatement.

VERIFIED DERIVATIVE COMPLAINT

39.     On September 15, 2004, Federal Insurance Company ("Federal"), AMS's directors' and officers' liability insurer, filed a complaint against AMS and defendants Tillinghast, Nicita, Leonard, Bartlett, Dawson, Leidich, Myhren, Swanson, Grout, Boyle, and others seeking, *inter alia*, a declaratory judgment that Federal had no obligation to pay defense costs under AMS's directors' and officers' excess insurance policy.

40.     On September 30, 2004, *The San Diego Union-Tribune* reported:

A former advertising executive at San Diego's Advanced Marketing Services pleaded guilty yesterday to conspiracy and fraud that inflated the company's earnings between 2001 and 2003 and cost the firm's customers nearly $7 million.

Marcy Roke, who formerly headed creative services in Advanced Marketing's advertising department, pleaded guilty before U.S. Magistrate Judge Nita Stormes in San Diego.

As part of her plea, Roke said she had conspired with several other Advanced Marketing employees in the fraudulent activities. The company fired Roke and two other high-ranking officials in the advertising department this year after the accounting practices came to light.

The guilty plea came the same day that the Securities and Exchange Commission filed civil charges against Roke, charging that her actions had inflated Advanced Marketing's earnings by about 9 percent in 2001, 10 percent in 2002 and 19 percent in 2003.

"The filing of the charges was coordinated (between the SEC and the Justice Department)," said Randall Lee, who heads the SEC's Pacific Regional Office in Los Angeles. "She pled guilty to the criminal charges, but the civil charges still face her."

Lee called the suit "an important first step" in the agency's efforts to punish anyone involved in helping inflate the firm's earnings.

"It's possible that other suits will be filed," said SEC trial attorney Molly White. "Our investigations are still continuing, and we don't know yet what we'll find."

Advanced Marketing spokesman Chuck Williams said the company doesn't know whether the SEC is looking at other current or former officials.

Roke's attorney, Frank T. Vecchione, was in court yesterday. He could not be reached for comment.

Roke faced a penalty of up to 20 years in prison and $500,000 in fines in the criminal case. But because of the plea bargain, prosecutors are recommending a prison sentence of as few as four years.

The SEC has not determined what penalties to seek in the civil case.

VERIFIED DERIVATIVE COMPLAINT

Advanced Marketing is a leading marketer and distributor for the book-publishing industry, placing best-selling books in such chain stores as Costco and Sam's Clubs. In addition, the firm creates advertising for the books, including direct-mail postcards.

According to statements yesterday by the SEC and U.S. Attorney Carol Lam, Roke and several colleagues were engaged in two fraudulent schemes.

In one scheme, Roke and her colleagues promised book publishers that Advanced Marketing would produce a certain number of postcard advertisements, but then would cut the number that were actually printed and sent out. They also arranged for fewer magazine ads than they promised their clients.

In addition, the advertising department downplayed its financial liabilities by failing to properly record the credits that the company owed retailers for certain advertising and promotional services.

"When the retailers did not take the credits due to them, instead of contacting the retailers and reconciling the amounts, Roke directed advertising and sales personnel to hide the discrepancies from the retailers, so that AMS could improperly reverse the liability and thereby decrease expenses and increase its income," said a statement yesterday from the SEC.

The Justice Department estimated that Advanced Marketing's clients lost $6,856,000 through such schemes.

The problems came to light after an internal audit in January. When Advanced Marketing revealed the fraud, its stock plummeted by nearly 15 percent and it was named in five shareholder lawsuits. The stock did not recover its value until June.

The firm is now recalculating its earnings for its 2004 fiscal year, which ended March 31, to ensure that its numbers are accurate. The firm estimates that its financial statements were inflated by about $10.1 million over the past seven years because of the improper activities of the advertising department.

41.   On March 3, 2005, *The San Diego Union-Tribune* reported:

Two federal agencies yesterday accused a former executive of Advanced Marketing Services of participating in schemes to defraud customers and inflate earnings at the wholesale book distributor.

Sandra Christie, vice president of advertising at the San Diego company from 1997 to 2004, helped devise fraudulent schemes that were carried out by Advanced Marketing's advertising department, according to a complaint filed in federal court by the U.S. Securities and Exchange Commission. The Justice Department later announced that a grand jury handed up a 33-count indictment charging Miller with conspiracy, wire fraud and falsifying the books and records at Advanced Marketing. It is the second enforcement action against a senior manager at Advanced Marketing, which distributes books for the publishing industry through chain stores such as Costco and Sam's Clubs.

VERIFIED DERIVATIVE COMPLAINT

The company has been embroiled in an accounting scandal since the SEC and the U.S. Attorney's Office in San Diego launched an investigation in 2003. In September, the SEC charged the company's former marketing director, Marcy Roke, with manipulating earnings during the same period. Roke pleaded guilty to conspiracy and wire fraud and awaits sentencing. Christie's attorney, Marc Greenberg, said he hadn't seen the SEC complaint and couldn't comment on the allegations. Greenberg couldn't be reached for comment after the criminal indictment was announced late yesterday.

"I'd expect she'll defend (herself against) the charges, but I don't even know what they are," Greenberg said of the complaint. The indictment and SEC lawsuit are similar in nature and revolve around allegations that Christie helped manipulate Advanced Marketing's earnings by booking revenue from publishing-house clients for advertising and marketing it never performed and by improperly claiming liabilities as income. The fraudulent schemes resulted in the overstatement of Advanced Marketing's pretax earnings by about 9 percent in fiscal 2001, 10 percent in 2002 and 19 percent in 2003, federal authorities said.

"Officers and managers of public corporations have an obligation to play by the rules when it comes to meeting financial expectations," U.S. Attorney Carol Lam said. "Engaging in corporate earnings fraud damages not only the victims and their employees, but also the shareholders of AMS and the unwitting employees who assumed AMS' officers were acting responsibly." The schemes were devised by Christie and other advertising personnel in 2000, when the advertising department was at risk of failing to meet its budget, according to the SEC complaint.

Responding to pressure from Advanced Marketing's senior executives for greater earnings, the advertising department began to routinely print and distribute fewer advertising and marketing products than it was contracted and paid to provide, the complaint said.

For example, Advanced Marketing informed publishers that its circulation for one advertising vehicle, a magazine called Pages, was 100,000, when in fact the company printed as few as 8,000 copies of the magazine during some months. This scheme resulted in publisher losses of about $6.8 million, according to the Justice Department.

Another scheme allegedly involved inflating advertising income by claiming potential liabilities as income.

In some instances, book retailers would provide marketing services for a publisher, then bill for those services through middleman Advanced Marketing to claim a share of a cooperative advertising budget pool. Advanced Marketing would invoice the publisher for the cost of the service, list it as a liability on its own books and wait for the retailer to take the credit. But retailers often failed to take the credits they were owed, and Advanced Marketing's advertising department then would improperly book the liability as a gain for itself, according to the SEC complaint. Advanced Marketing soon adopted the practice of intentionally refraining from providing retailers information about the credits due to them. The motto among Advanced Marketing executives was "we are not our customers' accounting departments," according to the complaint.

Christie also directed employees in the advertising department to withhold from retailers information about credits due to them, even when retailers called the company to ask about outstanding credits, the complaint said. The Justice

VERIFIED DERIVATIVE COMPLAINT

Department said the creation of false journal entries at Advanced Marketing to reverse about $ 4 million in unclaimed credits owed to warehouse club customers resulted in the appearance of inflated income for the advertising department and Advanced Marketing. During the time Christie participated in the fraudulent schemes, she received $72,000 in bonuses and from sales of Advanced Marketing stock, according to the SEC complaint.

Molly White, trial counsel for the SEC, said the agency continues to investigate "additional individuals" at Advanced Marketing. Advanced Marketing didn't return telephone calls yesterday, and the company's attorney couldn't be reached for comment.

42.    According to the SEC's Complaint against Christie,

From at least 2000 to 2003, AMS manipulated its earnings to meet Wall Street analysts' expectations and made misleading disclosures in its periodic reports, through at least two fraudulent schemes related to its advertising services. Defendant [Christie], the former Vice President of AMS's advertising department, was one of the individuals who instigated and participated in the fraudulent schemes.

In the first fraudulent scheme, AMS improperly manipulated its earnings by producing fewer advertising vehicles than it had contracted with publishers to provide. One advertising service that AMS provides to publishers is to print and mail advertising vehicles – such as inserts, catalogs, and post-cards – for books the publishers produce. AMS improperly recognized revenue on the full quantity of advertising vehicles that it had agreed to distribute, because it did not in fact produce the number of vehicles that it had contracted to produce.

In the second fraudulent scheme, AMS improperly increased its reported earnings by reversing certain liabilities when it was not entitled to do so. AMS had accrued a liability for credits that it expected its retail customers to take for certain advertising and promotional services that those customers provided. When the retail customers did not take the credits that were due to them, instead of contacting the retailers and reconciling the amounts of the credits, Christie and others directed advertising and sales personnel to hide the discrepancies from the retailers. Christie then directed accounting personnel to reverse the liability, which in turn reduced expenses, thereby ensuring that the advertising department achieved or exceeded its budget.

. . .

Beginning in 2000 and continuing into 2003, in order to meet the advertising budget and respond to pressure from AMS senior executives for greater earnings, the advertising department routinely printed and distributed fewer advertising vehicles than AMS had contracted to provide.

. . .

Reducing quantities became such standard business practice that the advertising department made little attempt to hide the practice. All documentation pertaining to a particular advertising vehicle, including the advertising contracts, the invoices from the printer, and the mailing house invoices, was kept in one promotion folder.

. . .

VERIFIED DERIVATIVE COMPLAINT

As an officer of AMS, Christie knew that it was important to AMS's senior executives that AMS meet or exceed earnings-per-share estimates. Christie and other corporate officers attended regular officer meetings, at which AMS's financial performance and anticipated results were discussed. At the officer meetings, a senior officer repeatedly expressed concern that AMS achieve its quarterly earnings-per-share target. The minutes of one such meeting, which Christie attended, state, "We need to do everything we can to bring EPS up to the lower level of what we gave the street: $.03 - .07." Materials distributed at the officer meetings sometimes showed forecasted contribution of the advertising department, as compared to AMS's net income and estimated earnings per share.

As an officer of AMS, Christie presented the advertising department's financial information to the Board of Directors in connection with AMS's strategic planning process. Developing budgets was a key component of the strategic planning process. The various vice presidents, including Christie, were responsible for preparing the initial drafts of the budgets for their departments. Those drafts were then reviewed and revised by upper management and ultimately approved by the Board of Directors.

43.     On March 29, 2005, AMS issued a press release which stated:

Advanced Marketing Services, Inc. (NYSE:MKT), a leading provider of customized wholesaling and distribution services to book retailers and publishers, today announced information concerning recent results of operations, the status of the pending government investigations and litigation, and related matters. The financial estimates included in this public announcement are preliminary and unaudited, and are subject to change.

The Company expects that consolidated net sales for the fiscal year ending March 31, 2005, will be in the range of between $940 and $970 million. The expected net sales are approximately nine percent less than net sales for the fiscal year ended March 31, 2004, due to the following: the industry-wide softness in book sales; the absence of new, highly successful books in the current fiscal year; and the previously announced end to the Company's unprofitable mass-market relationship with the Borders Group Inc. in February 2005.

The Company expects that its net loss for the fiscal year ending March 31, 2005, will be in the range of between $0.73 and $0.83 per share. This estimated net loss includes approximately $0.48 per share (net of related income tax effects) of legal, forensic accounting and auditing fees related to previously announced government investigations, litigation and restatement of financial statements, and the now completed independent internal review of the Company's cooperative advertising and other matters that was conducted at the direction of the independent members of the Company's Board of Directors. The estimated net loss also includes: an increase in distribution costs of approximately $0.34 per share (net of related income tax effects) resulting primarily from the closure of the Company's distribution center in Reno, Nevada, the consolidation of the Reno operations in the Company's Indianapolis, Indiana, distribution center, and the creation of a centralized returns center in Indianapolis; and approximately $0.05 per share (net of related income tax effects) for severance payments to former executives. These distribution and executive reorganization efforts now are substantially complete and, as a result, the Company expects related costs to return to historical levels in the coming fiscal year.

- 14 -

The Company's two largest customers have advised the Company that the Company has or soon will lose a minority portion of its share of book sales to those two customers. The Company believes that the effect will be to decrease consolidated net sales by an additional eight percent based upon recent sales. Based upon conversations with both customers, the Company believes it is possible to regain its prior share from both, although no assurance can be given that this will occur with either customer.

In the fiscal year ending March 31, 2005, the Company completed its internal review, continued to cooperate fully in the pending government investigations, and settled almost all cooperative advertising matters with customers and publishers. The Company has identified and recorded all adjustments from its internal evaluation of the historical financial statements subject to restatement and believes it is now substantially complete. The Company continues to work with its independent auditors to complete the audits of the restatement and its fiscal year ended March 31, 2004.

Prior to March 31, 2005, the Company will request from the New York Stock Exchange a three-month extension, through June 2005, to complete the filing of its Form 10-K for fiscal year 2004. There can be no assurance that the extension will be granted or that the Form 10-K will be filed. If the extension is not granted, the Company's stock may be subject to delisting from the New York Stock Exchange.

The Company also announced that the pending government investigations, reorganization and settlements have resulted in increased borrowings under its loan agreement. However, these costs are now decreasing and the Company has undertaken other cost containment and efficiency improvement actions. The Company believes its relationship with its bank is good, and the Company may explore additional sources of financing to assure sufficient liquidity.

## THE INDIVIDUAL DEFENDANTS ABDICATE THEIR FIDUCIARY DUTIES

44.     Since as early as 2003, the Individual Defendants received numerous reports regarding problems with AMS's accounting and internal control practices and procedures. Through their attendance at Board, Audit Committee, and officer meetings; their review of the Company's financial statements; conversations with the Company's management, internal auditors, and external auditors; and their participation in and/or approval of the Company's strategic planning and budgeting process, the Individual Defendants knew that AMS's internal controls were materially deficient.

45.     In breach of both their fiduciary duty of good faith and, with respect to the Audit Committee Defendants, their responsibilities pursuant to the Audit Committee Charter, the Individual Defendants wilfully ignored the obvious and pervasive problems with AMS's

VERIFIED DERIVATIVE COMPLAINT

1  accounting and internal control practices and procedures and made no effort to correct the

2  problems or prevent their recurrence.

3       46.    The foregoing misconduct of the Individual Defendants caused AMS to sustain

4  damages, including, but not limited to, costs and expenses associated with the Company's

5  restatement of historical financial results, internal and external investigations of the Company,

6  and the renegotiation of the Company's credit facilities.

7  **DERIVATIVE AND DEMAND ALLEGATIONS**

8       47.    Plaintiff brings this action derivatively in the right and for the benefit of AMS to

9  redress breaches of fiduciary duties by the Individual Defendants.

10      48.    Plaintiff will adequately and fairly represent the interests of AMS and its

11 shareholders in enforcing and prosecuting its rights.

12      49.    Plaintiff is an owner of AMS common stock and was an owner of AMS common

13 stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged

14 herein.

15      50.    On February 2, 2004, plaintiff made a demand on the Board of Directors of AMS

16 (the "Board") commence this action.  A copy of plaintiff's demand is attached hereto as Exhibit

17 A.

18      51.    As of the filing of this Complaint, the Board has not commenced an action as

19 demanded.

20 **COUNT I**

21 **AGAINST THE INDIVIDUAL DEFENDANTS**<br>**FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH**

22

23      52.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if

fully set forth herein.

24      53.    As alleged in detail herein, each of the Individual Defendants had a duty to, *inter*

25 *alia*, exercise good faith to ensure that the Company was operated in a diligent, honest and

26 prudent manner and, when placed on notice of improper or imprudent conduct by the Company

27

28

1   and/or its employees, exercise good faith in taking action to correct the misconduct and prevent

2   its recurrence.

3         54.    As alleged in detail herein, the Individual Defendants wilfully ignored the obvious

4   and pervasive problems with AMS's accounting and internal control practices and procedures

5   and made no effort to correct the problems or prevent their recurrence.  Thus, the Individual

6   Defendants abdicated their fiduciary duty of good faith.

7         55.    As a direct and proximate result of the Individual Defendants' foregoing breaches

8   of fiduciary duties, the Company has sustained damages, as alleged herein.

9         WHEREFORE, plaintiff demands judgment as follows:

10       A.    Against all of the Individual Defendants and in favor of the Company for
           the amount of damages sustained by the Company as a result of the

11              Individual Defendants' breaches of fiduciary duties;

12       B.    Granting appropriate equitable relief to remedy defendants' breaches of
           fiduciary duties;

13

14       C.    Awarding to plaintiff the costs and disbursements of the action, including
           reasonable attorneys' fees, accountants' and experts' fees, costs, and
           expenses;

15

16       D.    Granting such other and further relief as the Court deems just and proper.

17   DATED: April 5, 2005           Daniel L. Germain
                        ROSMAN & GERMAIN LLP

18
                        SCHIFFRIN & BARROWAY, LLP

19                           Eric L. Zagar

20

21
                        By: _____

22                           Daniel L. Germain
                        Attorneys for Plaintiffs

23

24

25

26

27

28

VERIFIED DERIVATIVE COMPLAINT

1

## JURY DEMAND

2

3    Plaintiffs demand a trial by jury.

4    DATED: April 5, 2005                    Daniel L. Germain
                                             ROSMAN & GERMAIN LLP
5
                                             SCHIFFRIN & BARROWAY, LLP
6                                            Eric L. Zagar

7

8                                   By:  _____
9                                             Daniel L. Germain
                                             Attorneys for Plaintiffs
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 18 -
VERIFIED DERIVATIVE COMPLAINT



**SCHIFFRIN & BARROWAY, LLP**
Attorneys at Law

THREE BALA PLAZA EAST, SUITE 400
BALA CYNWYD, PENNSYLVANIA 19004
(610) 667-7706 • FAX: (610) 667-7056
WWW.SBCLASSLAW.COM

RICHARD S. SCHIFFRIN*
ANDREW L. BARROWAY*
MARC A. TOPAZ*
DAVID KESSLER*
KRISHNA B. NARINE
KATHARINE M. RYAN
STUART L. BERMAN*
JACOB A. GOLDBERG

IAN D. BERG*
GREGORY M. CASTALDO*
DARREN J. CHECK*
EDWARD W. CHANG°°
EDWARD W. CIOLKO°
STEPHEN CONNOLLY
SEAN M. HANDLER
SCOTT K. JOHNSON*
CHAD E. KAUFFMAN*
MAX G. KRAMER*
RICHARD A. MANISKAS
STEPHEN P. MCFATE
JOSEPH H. MELTZER*
TOBIAS L. MILLROOD*

CHRISTOPHER L. NELSON
KAY E. SICKLES*
SANDRA G. SMITH
BENJAMIN J. SWEET
MARC D. WEINBERG*
PATRICIA C. WEISER*
ROBERT B. WEISER*
GERALD D. WELLS, III*
MARC I. WILLNER
ROBIN WINCHESTER*
MICHAEL K. YARNOFF**
ERIC L. ZAGAR
ANDREW L. ZIVITZ*

° ADMITTED IN MD
° ADMITTED IN NJ

* ALSO ADMITTED IN CA
* ALSO ADMITTED IN DE

* ALSO ADMITTED IN IL
* ALSO ADMITTED IN NJ

February 2, 2004

**VIA CERTIFIED MAIL**
Mr. Charles C. Tillinghast
Chairman of the Board
Advanced Marketing Services, Inc.
5880 Oberlin Drive
San Diego, CA 92121

    Re:    **Shareholder Demand Pursuant to Del. Ct. Ch. Rule 23.1**

Dear Mr. Tillinghast:

    This firm represents Randy Dubbert, a holder of shares of common stock of Advanced Marketing Services, Inc. ("AMS" or the "Company"). Pursuant to Del. Ct. Ch. Rule 23.1, I write on behalf of Mr. Dubbert to demand that the Board of Directors of AMS (the "Board") take action to remedy breaches of fiduciary duties by the directors and certain executive officers of the Company, including Michael C. Nicita, Michael J. Focht, Edward J. Leonard, Kevan M.. Lyon, Adam R. Zoldan, Steven T. Boyle, Sandra Miller Christie, and Mark J. Flournoy. Collectively, the foregoing executive officers and the directors of AMS will be referred to herein as the "Officers and Directors."

    As you are aware, by reason of their positions as officers and/or directors of AMS and because of their ability to control the business and corporate affairs of AMS, the Officers and Directors owe AMS and its shareholders the fiduciary obligations of good faith, loyalty, and due care, and are required to use their utmost ability to control and manage AMS in a fair, just, honest, and equitable manner. Mr. Dubbert believes that the Officers and Directors violated these core fiduciary duty principles, causing AMS to suffer damages.

    Mr. Dubbert contends that for several years the Company has engaged in improper conduct in connection with its participation in cooperative advertising. Mr. Dubbert contends that since 1998 the Company has: (i) improperly reported inflated circulation estimates for certain cooperative advertising publications; (ii) violated Generally Accepted Accounting Principles ("GAAP") by improperly recognizing revenue on certain cooperative advertising services; and (iii) violated GAAP by improperly reversing into income certain accrued liabilities related to cooperative advertising. Mr. Dubbert contends that the Officers and Directors knowingly approved, or were grossly negligent in failing to prevent and correct, the Company's

foregoing improper conduct, which resulted in: (i) investigations of the Company by the Securities and Exchange Commission ("SEC") and the U.S. Attorney's Office for the Southern District of California ("U.S. Attorney"); and (ii) the Company's restatement of its financial results for each quarterly and yearly period for the five years ended March 31, 2003.

Mr. Dubbert maintains that the Officers and Directors breached their fiduciary duties by: (i) knowingly approving the Company's foregoing improper conduct; and/or (ii) abdicating their responsibility to make a good faith effort to oversee the Company's operations and accounting practices. Mr. Dubbert believes that the acts (and failures to act) described above represent a systematic failure of the Officers and Directors to effectively manage the affairs of AMS. Among other things, it is apparent that the Officers and Directors have failed to implement necessary oversight procedures and controls to effectively manage AMS. The Officers' and Directors' systematic failure to properly manage the Company violates their fiduciary duties of loyalty and good faith. As a result of the Officers' and Directors' multiple breaches of duty, AMS has sustained damages, including, but not limited to, costs and expenses associated with: (i) the SEC's and U.S. Attorney's investigations; (ii) the Company's restatement of historical financial results; and (iii) the Company's default under its revolving credit agreement. Furthermore, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 and/or Delaware law, the Company is entitled to recover from certain executive officers all bonuses, restricted stock, stock options, and other incentive compensation received during certain periods.

Pursuant to Del. Ct. Ch. Rule 23.1, on behalf of Mr. Dubbert, I hereby demand that the Board commence a civil action against each of Officers and Directors to recover for the benefit of the Company: (i) the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein; and (ii) all bonuses, restricted stock, stock options, and other incentive compensation recoverable pursuant to the Sarbanes-Oxley Act and/or Delaware law.

If within a reasonable period of time after receipt of this letter the Board has not commenced an action as demanded herein, Mr. Dubbert will commence a shareholder's derivative action on behalf of AMS seeking appropriate relief.

Very truly yours,

SCHIFFRIN & BARROWAY, LLP

Eric L. Zagar

2

## VERIFICATION

I, Eric L. Zagar, hereby verify that I have reviewed the Complaint and authorized its filing and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: <u>March 30, 2005</u>

ERIC L. ZAGAR

JS44
(Rev. 07/89)

**CIVIL COVER SHEET** '05 CV 706 H (RBB)

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

Randy Dubbert, Derivatively on behalf of Nominal Defendant Advanced Marketing Services, Inc.

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Kansas
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS** Gary J. Bartlett, Steven T. Boyle, Sandra Miller Christie, Lynn S. Dawson, Mark J. Flournoy, Michael J. Focht, Bruce E. Grout, James A. Leidich, Edward J. Leonard, Kevan M. Lyon, Trygve E. Myhren, Michael M. Nash, William Swanson, Charles C. Tillinghast III, and Jose Roldan

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT San Diego
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Daniel L. Germain (310) 440-8600
Rosman & Germain LLP
815 Moraga Drive
Los Angeles, CA 90049

**ATTORNEYS (IF KNOWN)**

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☒ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)**

28 USC 1440        28:1332 ss GP

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | |
| ☒ 160 Stockholders Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC |
| ☐ 190 Other Contract | | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | Security Act | | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State |
| ☐ 290 All Other Real Property | | ☐ 555 Prisoner Conditions | | | ☐ 890 Other Statutory Actions |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding  ☐ 2 Removal from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   **DEMAND $** 75,000+   Check YES only if demanded in complaint: JURY DEMAND: ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE Jeffrey T. Miller   Docket Number 04-CV-00121 JM

DATE 4/5/05   SIGNATURE OF ATTORNEY OF RECORD

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

112603  4/6/05
250- JG7